UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| **CHRISTOPHER JARVIS PAYNE,** | § | |
| **#1048004,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | **SA-22-CV-00938-XR** |
| **v.** | § | |
| | § | |
| **HARLAN DUFFY, ET AL.,** | § | |
| | § | |
| **Defendants.** | § | |

## ORDER

Before the Court are *pro se* Plaintiff Christopher Jarvis Payne's 42 U.S.C. § 1983 Third Amended Civil Rights Complaint and supplement, Defendant San Antonio Police Department ("SAPD") Officer Harlan Duffy's "Motion to Dismiss Pursuant to Fed. R. Civ. P. 12(c) and/or Motion for Summary Judgment Pursuant to Fed. R. Civ. P. 56," and Payne's Motion for Summary Judgment and supplements. (ECF Nos. 14, 18, 44, 52, 54, 58, 61). Upon review, the Court orders Officer Duffy's motion for summary judgment **GRANTED**, Payne's motion for summary judgment **DENIED**, and Payne's claim against Defendant Joseph Sirola **DISMISSED WITHOUT PREJUDICE** for want of prosecution. (ECF Nos. 14, 18, 44, 52).

### PROCEDURAL BACKGROUND

Bexar County records show Payne is currently confined in the Bexar County Adult Detention Center ("BCADC") based on indictments for: (1) aggravated assault with a deadly weapon; and (2) aggravated assault against a public servant. *See* Register of Actions - DC2021CR3349 (tylertech.cloud) (last visited Aug. 29, 2024); Register of Actions - DC2022CR6932 (tylertech.cloud) (last visited Aug. 29, 2024); Jail View (tylertech.cloud) (last visited Aug. 29, 2024). Payne is awaiting trial. *See id.*

While confined, Payne filed this § 1983 action against numerous Defendants. (ECF No. 1). Upon review, the Court determined the Complaint had a number of deficiencies and rendered a Show Cause Order requiring Payne to file an amended complaint, correcting, to the extent possible, the noted deficiencies. (ECF No. 5). In response, Payne filed an Amended Complaint, a Second Amended Complaint, and finally, a Third Amended Complaint, which is the live pleading. (ECF Nos. 7, 8, 14). He subsequently filed a supplement to the Third Amended Complaint. (ECF No. 18).

In the Third Amended Complaint, Payne names sixty–seven (67) Defendants. (ECF No. 14). The majority of the Defendants are officers from the BCADC, but the list of Defendants also includes: (1) Bexar County Judge Ron Rangel; (2) Bexar County Magistrate Judge Andrew Carruthers; (3) Bexar County Sheriff Javier Salazar; (4) University Health System Hospital; (5) AAA Garcia Bail Bond Co.; (5) SAPD Officer Harlan Duffy; and (6) a defendant identified by Payne as "Joseph Sirola." (*Id.*). As for his claims, Payne alleges numerous constitutional violations, including Fourth Amendment excessive force claims against Officer Duffy and "Joseph Sirola." (*Id.*).

After reviewing the Third Amended Complaint, the Court rendered an Order of Partial Dismissal in which it dismissed Payne's claims against all named defendants except Officer Duffy and "Joseph Sirola." (ECF No. 19). Following service, Officer Duffy answered and then filed his dispositive motion. (ECF Nos. 10, 13, 30, 44). Payne filed his own motion for summary judgment in response to Officer Duffy's dispositive motion, along with a supporting affidavit and several supplements. (ECF Nos. 52, 54, 58, 61).

As to the defendant identified by Payne as "Joseph Sirola," who Payne contends was an SAPD officer involved with Officer Duffy in the alleged excessive force incident, the Court's attempted service was ineffective. (ECF Nos. 20, 21, 25). In response to an Order, Officer Duffy filed an Advisory in which he provided proof, through a sworn declaration from an SAPD sergeant in the Sworn Personnel Deployment Office, that no one named "Joseph Sirola" was currently or previously employed by SAPD. (ECF Nos. 24, 26). Payne never responded to the Advisory nor did he file any motions or other documentation in an effort to properly identify the other SAPD officer he claims was involved in the alleged excessive force incident. Based on Payne's inability to identify the other SAPD officer, the Court was unable to execute service on the defendant incorrectly identified by Payne as "Joseph Sirola." As the plaintiff, it was Payne's obligation to provide the Court with sufficient information needed to serve the named defendants. *See Kersh v. Derozier*, 851 F.2d 1509 (5th Cir. 1988). Because Payne failed in this obligation, the Court finds his claim against the defendant identified as "Jospeh Sirola" is subject to dismissal for want of prosecution. *See* FED. R. CIV. P. 41(b). Accordingly, the only claim remaining for this Court's review is Payne's Fourth Amendment excessive force claim against Officer Duffy.

## STANDARD OF REVIEW

A district court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *see Funches v. Progressive Tractor & Implement Co.*, 905 F.3d 846, 849 (5th Cir. 2018). Where the nonmovant bears the burden of proof at trial, the summary judgment movant must offer evidence that undermines the nonmovant's claim or point out the absence of evidence supporting essential elements of the nonmovant's claim; the movant may, but need not,

negate the elements of the nonmovant's case to prevail on summary judgment. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 885 (1990). A complete failure of proof on an essential element of the nonmovant's case renders all other facts immaterial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

Once the movant shows entitlement to judgment as a matter of law, the nonmovant must bring forward *evidence* to create a genuine issue of material fact. *Giles v. Gen. Elec. Co.*, 245 F.3d 474, 493 (5th Cir. 2001). "The *evidence* of the non–movant is to be believed, and all *justifiable* inferences are to be drawn in his favor." *Darden v. City of Fort Worth*, 880 F.3d 722, 727 (5th Cir.), *cert. denied*, 139 S.Ct. 69 (2018) (emphasis added) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). Mere allegations in the nonmovant's complaint are not evidence. *Wallace v. Tex. Tech Univ.*, 80 F.3d 1042, 1047 (5th Cir. 1996). However, verified allegations in an inmate–plaintiff's complaint are deemed competent summary judgment evidence. *See Al–Raid v. Ingle*, 69 F.3d 28, 32 (5th Cir. 1995). Nevertheless, even verified allegations cannot defeat summary judgment if they are simply "conclusory allegations," "unsubstantiated assertions," or constitute "only a scintilla of evidence." *Little v. Liquid Air. Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994); *see Hunt v. Pierson*, 730 F. App'x 210, 212 (5th Cir. 2018) (quoting *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007)).

When, as here, a defendant properly asserts qualified immunity, the burden shifts to the plaintiff to demonstrate the defendant is not entitled to immunity by showing a violation of an actual constitutional right that was clearly established at the time of the alleged violation. *See Escobar v. Montee*, 895 F.3d 387, 393 (5th Cir. 2018); *Romero v. City of Grapevine*, 888 F.3d 170,

176 (5th Cir. 2018). Despite this shifting burden, a court must still "view the facts in the light most favorable to the nonmoving party." *Darden*, 880 F.3d at 727 (alteration marks omitted).

Although the Court must construe the facts in favor of the nonmovant, in examining video evidence, the Fifth Circuit has stated it "assign[s] greater weight, even at the summary judgment stage, to the facts evident from video recordings taken at the scene." *Poole v. City of Shreveport*, 691 F.3d 624, 627 (5th Cir. 2012) (quoting *Carnaby v. City of Houston*, 636 F.3d 183, 187 (5th Cir. 2011)); *see Scott v. Harris*, 550 U.S. 372, 381 (2007) (holding that court may not rely on plaintiff's description of facts where record discredits such description but should instead consider "the facts in the light depicted by the videotape."); *Waddleton v. Rodriguez*, 750 F. App'x 248, 254 (5th Cir. 2018) (stating that "[t]his court will not adopt facts that are clearly contradicted by the video such as Waddleton's denial that he acted belligerently or resisted the officers.").

Whether qualified immunity is at issue or not, the Fifth Circuit requires a nonmovant to submit "significant probative evidence" from which the jury could reasonably find for the nonmovant. *State Farm Life Ins. Co. v. Gutterman*, 896 F.2d 116, 118 (5th Cir. 1990). The nonmovant's evidence must raise more than some "metaphysical doubt as to the material facts." *Funches*, 905 F.3d at 849. A genuine issue of fact does not exist "if the record taken as a whole could not lead a rational trier of fact to find for the non–moving party." *Hunt*, 730 F. App'x at 212 (quoting *City of Alexandria v. Brown*, 740 F.3d 339, 350 (5th Cir. 2014)). Moreover, when the opposing parties tell different stories and one is "blatantly contradicted by the record" such that "no reasonable jury could believe it," the reviewing court may not adopt the contradicted version of the facts for purposes of summary judgment. *Scott v. Harris*, 550 U.S. 372, 380 (2007).

**ANALYSIS**

Based on the Court's review of Payne's various pleadings, the Court finds he has alleged a Fourth Amendment excessive force claim against Officer Duffy. (ECF Nos. 14, 18, 52, 54, 58, 61). Specifically, Payne contends that on March 6, 2022, while trying to detain him as a suspect in an assault, Officer Duffy tasered him in the face, causing injury to his eye and face. (ECF Nos. 14, 18, 52, 54). Payne states Officer Duffy's actions were undertaken for "no apparent reason" and "unwarranted." (*Id.*). In response to Payne's allegations, Officer Duffy filed a motion to dismiss or alternatively, a motion for summary judgment. (ECF No. 44). The Court shall address Officer Duffy's request for judgment based on his motion for summary judgment in which he contends he is entitled to judgment as a matter of law based on qualified immunity. (*Id.*); *see* FED. R. CIV. P. 56(a).

**A.  Substantive Law**

    *1.  Qualified Immunity*

Qualified immunity shields government officials from liability as long as the conduct in questions does not violate clearly established constitutional rights. *Ashcroft v. Iqbal*, 556 U.S. 662, 672 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). It "is both a defense to liability and a limited entitlement not to stand trial or face the other burdens of litigation." *Id.* (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985)). Qualified immunity "provides ample protection to all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986). It is a shield from "'undue interference'" with a government official's duties and "'potentially disabling threats of liability.'" *Collie v. Barron*, 747 F. App'x 950, 952 (5th Cir. 2018) (quoting *Harlow*, 457 U.S. at 806). When resolving questions of qualified

6

immunity, a reviewing court "engage[s] in a two–pronged inquiry." *Tolan v. Cotton*, 572 U.S. 650, 655 (2014) (per curiam); *Cruz*, 96 F.4th at 813. Under the first prong, the Court must determine whether the facts alleged by the plaintiff "make out a violation of a constitutional right." *Darden v. City of Fort Worth, Tex.*, 880 F.3d 722, 727 (5th Cir.), *cert. denied*, 202 U.S. 23 (2018) (quoting *Pearson v. Callahan*, 555 U.S. 223, 232 (2009)); *Bush v. Strain*, 513 F.3d 492, 500 (5th Cir. 2008). The second prong requires the Court to determine whether the right in question was "clearly established" at the time of the alleged constitutional violation. *Darden*, 880 F.3d at 727; *Bush*, 513 F.3d at 500.

As set out above, a defendant's assertion of qualified immunity alters the usual summary judgment burden of proof, shifting it to the plaintiff to show that the defense is not available. *Escobar*, 895 F.3d at 393; *Romero*, 888 F.3d at 176. The plaintiff "must rebut the defense by establishing a genuine fact dispute as to whether the official's allegedly wrongful conduct violated clearly established law." *Dyer v. Houston*, 964 F.3d 374, 380 (5th Cir. 2020) (citations and internal quotation and alteration marks omitted). "Qualified immunity is a complete defense, and [a defendant is] entitled to summary judgment on the basis of qualified immunity unless [the plaintiff] can show triable issues as to whether [the defendant] violated a clearly established right of which a reasonable officer would have been aware." *Brewer v. Hayne*, 860 F.3d 819, 824 (5th Cir. 2017).

### 2. *Excessive Force*

When a plaintiff alleges law enforcement officials used excessive force while making an arrest, the federal right at issue is the Fourth Amendment right against unreasonable seizures. *Tolan*, 572 U.S. at 656. A Fourth Amendment violation occurs when an arrestee "suffers an injury that results directly and only from [the officer's] clearly excessive and objectively unreasonable

use of force." *Betts v. Brennan*, 22 F.4th 577, 582 (5th Cir. 2022) (quoting *Joseph ex rel. Estate of Joseph v. Bartlett*, 981 F.3d 219, 332 (5th Cir. 2020)). To avoid dismissal when an officer has pled qualified immunity, a plaintiff must establish the existence of a genuine issue of fact as to whether the officer's allegedly wrongful conduct violated the Fourth Amendment. *Darden*, 880 F.3d at 727. Thus, under the first prong of the qualified immunity inquiry, the plaintiff must produce evidence of an injury that resulted directly and only from a use of objectively unreasonable force that was clearly excessive to the need. *Id.*; *Bush*, 513 F.3d at 500–01.

Excessive force claims are necessarily fact–intensive, and whether the force used is unreasonable or excessive depends on the particular facts and circumstances of the case at hand. *Darden*, 880 F.3d at 728. The Court must consider the totality of the circumstances, including: (1) the severity of the crime at issue; (2) whether the suspect poses an immediate threat to the officers' safety or the safety of others; (3) whether the suspect is actively resisting arrest or attempting to evade arrest by flight; and (4) the relationship between the need for force and the amount of force used. *Id.* at 728–29 (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)). Moreover, since the Supreme Court's decision in *Graham*, excessive force cases have also emphasized:

> [T]he speed with which an officer resorts to using force rather than verbal commands and/or negotiations; the amount of time that an officer has to decide the type and amount of force to use; whether the officer responds with "measured and ascending" actions corresponding with the plaintiff's "escalating verbal and physical resistance" or aggression; whether the plaintiff has ignored the officer's prior command(s); whether the plaintiff has a weapon and/or acts in a manner suggesting intended use of a visible—or hidden—weapon; whether the plaintiff moves outside the officer's line of vision; whether the plaintiff acts in an erratic, unexplained manner; and whether the plaintiff moves toward or away from an officer.

*Singleton v. Casanova*, No. 22-50327, 2024 WL 2891900, at *5 (5th Cir. June 10, 2024) (citing *Harmon v. City of Arlington, Tex.,* 16 F.4th 1159, 1164–65 (5th Cir. 2021); *Poole v. City of Shreveport*, 13 F.4th 420, 425 (5th Cir. 2021); *Batyukova v. Doege*, 994 F.3d 717, 726–29 (5th Cir. 2021); *Joseph on behalf of Est. of Joseph v. Bartlett*, 981 F.3d 319, 339 (5th Cir. 2020); *Garza v. Briones*, 943 F.3d 740, 746 (5th Cir. 2019); *Hanks v. Rogers*, 853 F.3d 738, 747 (5th Cir. 2017); *Brothers v. Zoss*, 837 F.3d 513, 520 (5th Cir. 2016); *Poole v. City of Shreveport*, 691 F.3d 624, 629 (5th Cir. 2012); *Manis v. Lawson*, 585 F.3d 839, 844–46 (5th Cir. 2009); *Reese*, 926 F.2d 494, 500–01 (5th Cir. 1991)). "In short, 'the information an officer possesses when that officer takes an action impacts [] the objective legal reasonableness of the officer's conduct.'" *Id.* (quoting *Gutierrez v. City of San Antonio*, 139 F.3d 441, 448 (5th Cir. 1998) (citing *Anderson v. Creighton*, 483 U.S. 635, 641 (1987)).

"Importantly, '[a] court must measure the force used under the facts as a reasonable officer would *perceive* them, not necessarily against the historical facts.'" *Id.* at *6 (quoting *Griggs v. Brewer*, 841 F.3d 308, 313 (5th Cir. 2016) (emphasis in original) (citing *Hill v. Carroll Cnty., Miss.*, 587 F.3d 230, 234 (5th Cir. 2009)). In other words, the Court focuses on the officer's perception of the events as they happened "without the aid of hindsight, multiple viewing angles, slow motion, or the ability to pause, rewind, and zoom." *Tucker v. City of Shreveport*, 998 F.3d 165, 167 (5th Cir. 2021). And, as always, the Court must be mindful that, "the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Graham*, 490 U.S. at 396.

"Likewise, '[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense,

uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.'" *Singleton*, 2024 WL 2891900, at *6 (quoting *Graham*, 490 U.S. at 396–97). Thus, upon review, a court must be guarded, resisting the urge to second–guess an officer's assessment of the threat he or she faces. *Id.* (quoting *Harmon*, 16 F.4th at 1163 (quoting *Ryburn v. Huff*, 565 U.S. 469, 477 (2012) (per curiam)). As recently reiterated by the Fifth Circuit, "'[t]o be reasonable is not to be perfect, and so the Fourth Amendment allows for some mistakes on the part of … officials, giving them 'fair leeway for enforcing the law in the community's protection.'" *Id.* (quoting *Heien v. North Carolina*, 574 U.S. 54, 60–61 (2014) (quoting *Brinegar v. United States*, 338 U.S. 160, 176 (1949)). "Even a mistaken belief can still be a reasonable belief." *Id.* (citing *Wilson v. City of Bastrop*, 26 F.4th 709, 715 (5th Cir. 2022) (citing *Saucier v. Katz*, 533 U.S. 194, 206 (2001)).

Moreover, as stated above, the inquiry into the use of force is an objective one. *Graham*, 490 U.S. at 397. An officer's underlying, subjective intent or motivation is irrelevant. *Id*. "Accordingly, '[a]n officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force; nor will an officer's good intentions make an objectively unreasonable use of force constitutional.'" *Singleton*, 2024 WL 2891900, at *6 (quoting *Graham*, 490 U.S. at 397).

### B.  Application of Standard of Review and Substantive Law

As previously stated, Payne bases his excessive force claim on his contention that during the course of Officer Duffy's attempt to detain and arrest him, the officer tased him in the face. (ECF Nos. 14, 18, 52, 54). Payne states Officer Duffy should not have attempted to detain him, much less tase him, because he had done nothing wrong and did not match the description of the

assault suspect, describing his stop as nothing more than "racial profiling." (ECF Nos. 54, 58, 61). He describes Officer Duffy's actions as "objectively unreasonable," "excessive to the need," and "unjust." (ECF Nos. 14, 54).

Because Officer Duffy has alleged the defense of qualified immunity, the burden is on Payne to show a violation of an actual constitutional right. *See Escobar*, 895 F.3d at 393; *Romero*, 888 F.3d at 176. And, although the verified allegations in Payne's pleadings (which in this case include his live Complaint and supplement, and motion for summary judgment, supporting affidavit and supplements) are competent summary judgment evidence, they are insufficient to defeat summary judgment if they are nothing more than conclusory allegations or unsubstantiated assertions. *See Little*, 37 F.3d at 1075. But, even when the ordinary summary–judgment standard applies, "the court must measure [the] force used under the facts as a reasonable officer *would perceive them*." *Griggs*, 841 F.3d at 313 (emphasis in original). Thus, the court "first constru[es] disputed historical facts in favor of the non-movant, [and] . . . then ask[s] how a reasonable officer would have perceived those historical facts." *Id.* at 313–14 (quoting *Hill*, 587 F.3d at 234); *see also Buehler v. Dear*, 27 F.4th 969, 984 (5th Cir. 2022) (same).

As summary judgment evidence, Officer Duffy produced his sworn statement and video from his body camera.[1] (ECF Nos. 44, Exhs. A, B). In his sworn statement, Officer Duffy, a patrol officer with SAPD since 2018, states that on March 6, 2022, around 10:30 p.m., he was dispatched to the scene of an assault in progress on the frontage road of Southeast Loop 410. (*Id.*, Exh. B).[2] When he arrived, Officer Duffy spoke to the male victim who stated a "black male" assaulted him

---

[1] The body camera video was authenticated by a sworn statement from Officer Duffy. (ECF No. 44, Exh. B).

[2] Except where noted, the summary judgment evidence described in the following paragraphs came entirely from Officer Duffy's sworn statement. (ECF No. 44, Exh. B).

with "a lunchbox[,]" striking him "in the nose area." The victim said the assailant was wearing a white shirt and black pants.

After talking to the victim, Officer Duffy returned to his patrol car and began driving down the access road in an effort to find the suspect described by the victim. Another SAPD officer, Ashley Montero, who was driving her own patrol vehicle, joined Officer Duffy in the search. A short distance down the access road, Officer Duffy saw a "black male wearing a white shirt and carrying what appeared to be a lunchbox." According to Officer Duffy, this was the only individual he saw walking along the access road. The officer activated his emergency lights and approached the individual, later identified as Payne. When Officer Duffy exited his vehicle, he ordered Payne to get on the ground because Payne matched the description of the assailant and the crime in question was an assault involving an injury. Officer Duffy states his intent was to detain Payne for further investigation.

Payne was "argumentative and repeatedly refused to follow" Officer Duffy's "repeated commands to get on the ground." Payne admits refusing to "get on the ground." (ECF No. 54). Officer Duffy then saw Payne reach down and grab "something" with his right hand but could not initially determine what he grabbled. However, as Payne moved toward him, Officer Duffy saw "the blade of a knife," causing the officer to reach for his service weapon. Payne "advanced quickly" toward Officer Duffy and according to the officer "was close enough to stab me." Payne had the knife in his right hand and tried to stab Officer Duffy. Although Officer Duffy had his finger on the trigger, he could not fire because Officer Montero was behind Payne, and he could not risk shooting her by mistake. So, Officer Duffy backed away, but fell. After Officer Duffy fell, Payne ran behind Officer Montero's patrol vehicle. Payne was yelling at the officers and Officer

12

Duffy was ordering Payne to put down the knife and get on the ground. Payne continued to refuse commands.

As this was going on, vehicles continued to drive by on the access road and some of them actually stopped. Officer Duffy was afraid Payne might "rush at the civilians in the vehicles" so he got between Payne and the vehicles. When he did, Payne advanced toward him again and took a throwing stance. Officer Duffy stated he feared he might be killed or seriously injured. Payne then threw the knife at Officer Duffy; the officer ducked. Payne ran at the officer. Officer Duffy holstered his weapon so he could grab Payne. Payne swung and hit Officer Duffy and then ran past him toward the door of a civilian's truck. Believing Payne might attempt to get into the civilian's truck, Officer Duffy pursued him. Payne jumped into the bed of the truck. The officer again tried to grab Payne, but he jumped out of the truck bed and began running down the road with the officer in pursuit. According to Officer Duffy, Payne was running toward the items he had dropped earlier, and the officer feared he might be attempting to retrieve another weapon. He also feared Payne might attempt to enter one of the patrol vehicles and escape. So, as he chased Payne, Officer Duffy pulled out his taser. When he got close enough he deployed the taser, aiming for Payne's back. Payne was struck with the taser probes and fell to the ground. Officer Duffy then pressed the taser against Payne's back but did not discharge it again. He tried to get control of Payne's hands, but required assistance from another officer who had arrived, SAPD Officer Torres.

As noted above, in addition to his sworn statement, Officer Duffy proffers as summary judgment evidence video from his body camera. (ECF No. 44, Exh. B). The video first shows Officer Duffy driving to the scene of the alleged assault. (*Id.* at 0:00:00–0:01:13). Upon arrival, the officer approaches an older Hispanic man. (*Id.* at 0:01:13–0:01:28). The man, who is sixty

years old, tells Officer Duffy that he was walking back home from the store when "some black dude" came from "somewhere" and hit him in "the nuts" and the nose with what he described as a "lunchbox." (*Id.* at 0:01:32–:45, 0:02:05, 0:02:09). The video shows the victim's bloodied and injured nose (*Id.* at 0:02:05–:08). The victim described the as perpetrator a thin black man, about his height, wearing a white t–shirt and black pants. (*Id.* at 0:01:57–0:02:00, 0:02:24–:28). After learning the perpetrator fled down the access road approximately five minutes earlier, Officer Duffy advised the victim to wait for another officer and proceeded down the access road in his patrol car in search of the suspect. (*Id.* at 0:01:55, 0:02:13–0:05:12). Approximately three minutes later, Officer Duffy spots a man, later identified as Payne, matching the victim's description of the perpetrator—a thin, black male wearing a white t–shirt. (*Id.* at 0:05:12–:21). Although the man is not wearing black pants, he has black socks showing between his boots and long shorts. (*Id.*). The man is holding a black box with a handle that it could be described as a "lunchbox." (*Id.* at 0:05:26).

Believing the man to be the suspect described by the victim, Officer Duffy pulls over, exits his vehicle and walks toward the suspect asking the suspect to do him a "favor" and get on the ground. (*Id.* at 0:05:13–:26). Despite the instruction to get on the ground, Payne begins walking toward Officer Duffy. (*Id.* at 0:05:26). The officer tells Payne multiple times to get on the ground; Payne remains standing, asking "What'd I do?" (*Id.* at 0:05:26–:32). Without warning, Payne rushes the officer, a knife in his right hand. (*Id.* at 0:05:33–:34). Officer Duffy attempts to retreat from Payne's attack, yelling "get back, get back," and "he has a f*cking knife, but Payne continues running toward the officer and attempts to stab him. (*Id.* at 0:05:34–:38). Officer Duffy falls to the ground and Payne then runs around him, ending up behind Officer Montero's patrol vehicle. (*Id.* at 0:05:39–:43).

14

Officer Duffy gets to his feet and pulls out his service weapon, yelling that he has a suspect at gun point. (*Id.* at 0:05:41–:43). Payne is screaming, "shoot me, shoot me" over and over as he walks out from behind the patrol vehicle still holding the knife. (*Id.* at 0:05:43–:53). Officers Duffy and Montero are yelling for Payne to put the knife down; Payne does not comply, telling the officers to "take it" and "you're going to have to take it." (*Id.* at 0:05:53–0:06:01). Payne then darts back behind Officer Montero's vehicle, repeatedly yelling "take it," and "what'd I do." (*Id.* at 0:06:04–:07). Officer Duffy radioed that they had Payne at gunpoint, Payne still had the knife in his hand, and that they needed additional officers now. (*Id.* at 0:06:17–:19). Officer Duffy again orders Payne to put the knife down; Payne continues yelling. (*Id.* at 0:06:26–:32). Officer Duffy repeatedly orders Payne to get on the ground, but Payne remains standing, saying, among other things, "I ain't going back." (*Id.* at 0:06:35–:53). Officer Duffy continues to order Payne to get on the ground; Payne verbally refuses, challenges the officers to "come on," curses at the officers, and yells he is not a "slave." (*Id.* at 0:06:55–0:07:20). During his exchange with officers, Payne walks back and forth from behind the vehicle onto the access road shoulder. (*Id.* at 0:06:04–0:07:20).

Officer Duffy continues to tell Payne to get on the ground as Payne yells incoherently. (*Id.* at 0:07:29–:41). Payne then begins walking toward Officer Duffy, repeatedly taunting the officer to shoot him as the officer gives him multiple warnings to "stay back." (*Id.* at 0:07:55–0:08:10). Payne suddenly hurls the knife at Officer Duffy but misses him. (*Id.* at 0:08:11–:12). Payne begins aggressively running toward Officer Duffy and upon reaching the officer, begins to strike at him, and although the officer had his service weapon out, he did not fire at Payne. (*Id.* at 0:08:12–:16). Payne then turns and begins to run down the road with Officer Duffy

in pursuit. (*Id.* at 0:08:17). Payne jumps in and out of the back of a civilian's truck bed—during the event, traffic continued to pass by and stop near the scene. (*Id.* at 0:08:20–:22). Payne attempted to escape, running away as Officer Duffy pursues him on foot. (*Id.* at 0:08:22–:28). Officer Duffy catches up to Payne and from behind deploys his taser, striking Payne who falls to the ground. (*Id.* at 0:08:29). Because Officer Duffy was running, the body camera video is jumpy, but it appears from the glow of the taser prongs that Payne was struck on the left side of his face. (*Id.* at 0:08:22–:35). Officer Duffy later states he was simply trying "to get a bead on Payne" and did not initially realize the taser hit Payne in the "cheek." (*Id.* at 0:33:16–:19). He further states he "was just trying to get a big part of [Payne's] body" with the taser. (*Id.* at 0:41:55). The video is clear that Officer Duffy was behind Payne, who was running away, when he deployed the taser. (*Id.* at 0:08:22–:29).

Once on the ground, Officer Duffy orders Payne not to move. (*Id.* at 0:08:34). Payne appears to resist, holding his right forearm and hand underneath hi body, forcing Officer Duffy and another officer to pull it behind his back as Payne asks officers to "kill" him. (*Id.* at 0:08:37–0:09:12). Payne remains on the ground under the supervisor of other officers as Officers Duffy and Montero, along with other officers, secure the scene and search for the knife thrown by Payne, finally locating it in a grassy area near the access road. (*Id.* at 0:09:12–0:18:13).

While on the ground and handcuffed, Payne threatens to "beat" officers and "fight" all of them. (*Id.* at 0:16:59, 0:24:41). He continues to struggle, requiring three officers to restrain him. (*Id.* at 0:25:52–:59). Officer Montero is heard advising Officer Duffy that while on the ground Payne kicked another officer. (*Id.* at 0:18:42). Officer Duffy, who had no more physical interaction with Payne after he was handcuffed, describes Payne as "higher than a kite right now." (*Id.* at

16

0:19:32). Payne was examined by EMTs at the scene. (*Id.* at 0:42:24–0:49:51). Payne remained handcuffed and on the ground, lying or sitting, until he was carried and placed in an SAPD transport van. (*Id.* at 0:56:02–0:58:18). He resisted officers' efforts to transfer him to the van and verbally threatened them. (*Id.* at 0:56:02–:11, 0:56:23). He kicked open the interior door of the van after being placed in a seat and continued to kick the door once it was closed by officers. (*Id.* at 0:58:21–0:59:35).

Reviewing the summary judgment evidence in light of the *Graham* factors, the factors recognized in *Singleton*, and the elements necessary to establish excessive force, the Court finds the summary judgment evidence establishes an absence of excessive force by Officer Duffy. *See Graham*, 490 U.S. at 396; *Singleton*, 2024 WL 1891900, at *5. To begin, the crimes at issue in this matter—the initial assault and the subsequent aggravated assault on Officer Duffy—are first–degree felonies, i.e., serious offenses. *See* TEX. PENAL CODE ANN. §§ 22.02. The summary judgment evidence shows Payne matched the description given to Officer Duffy by the assault victim—thin black male wearing a white t–shirt, and carrying a "lunchbox," who took off down the access road. According to Officer Duffy, Payne was the only person walking along the access road and he was found within minutes of the alleged assault. This information gave the officer probable cause for an investigatory stop.

The summary judgment evidence establishes Payne was combative, uncooperative, and resistant to orders from the moment Officers Duffy and Montero approached him. Officer Duffy ordered Payne to get on the ground multiple times. Payne, however, not only refused the officer's orders, but then walked toward him. Payne then rushed at Officer Duffy with a knife, attempting to stab him. These actions are clearly seen in the video. Officer Duffy retreats and falls to the

ground; Payne runs around him, seeking cover behind Officer Montero's patrol vehicle. When Officer Duffy gets back on his feet, he pulls out his service weapon and points it at Payne, who is challenging the officer to "shoot" him as he did throughout the encounter. Both officers yell at Payne, ordering him to put down the knife, which is still in his hand. Payne refuses, telling the officers they are "going to have to take it." Payne darts back and forth behind Officer Montero's patrol vehicle, agitated and non–compliant. Payne is repeatedly ordered to put down the knife and get on the ground, but Payne defies both orders and continues to challenge the officers while holding the knife. Payne then begins to walk toward Officer Duffy, taunting him while the officer warns him multiple times to "stay back." Payne then throws the knife directly at Officer Duffy. Payne then runs toward the officer with his hands raised, attempting to strike him. Officer Duffy fends off the attack without discharging his service weapon, which was drawn. Payne then turns and runs down the access road toward the location where he had dropped the items he was carrying prior to the stop. Officer Duffy pursued Payne, fearing he might be attempting to secure another weapon, take one of the patrol vehicles, or take a vehicle from a civilian. Payne jumped into and out of a civilian's truck bed, continuing to evade Officers Duffy and Montero. Officer Duffy admittedly tased Payne during the pursuit, striking him on the left side of the face, but advised in his statement and the video that he was aiming for Payne's back, "trying to get a big part of [Payne's] body." Once on the ground, Payne continued resisting, struggling with officers. It took two officers to restrain and handcuff him. Even when subdued, Payne continued to verbally threaten the officers on the scene, and he kicked another officer. Even when placed in the transport van Payne was resistant and aggressive, kicking the interior door of the van multiple times.

Payne does not dispute his combativeness and resistance to the officers' multiple orders. (ECF Nos. 14, 18, 52, 54, 58, 61). Nor does he deny attacking Officer Duffy with the knife and his hands, seemingly justifying his actions based on his claims that: (1) he "didn't do anything;" (2) he feared for his life based on "other incidences" involving black men and law enforcement; (3) the stop was based on racial profiling, and (4) he did not match the victim's description of the assailant. (ECF Nos. 54, 58). In the affidavit to his motion for summary judgment, Payne admits Officer Duffy ordered him to get on the ground, but he refused, telling the officer he "didn't do anything to anybody" and that the officer should stop following him and harassing him. (*Id.*). He admits he walked away and then ran from the officers, but claims he stopped running and turned around, walking away from Officer Duffy while looking back at him. (ECF No. 54). He claims that is when Officer Duffy shot him in the face with the taser, the basis for his excessive force claim. (*Id.*).

The video evidence, however, contradicts Payne's claim that he stopped and was merely walking and looking back at Officer Duffy when he was tased, implying the officer intentionally shot him in the face. Both Payne and Officer Duffy were at a full run when the officer deployed the taser. Officer Duffy states he was aiming for Payne's back and just trying to get a "big part of [Payne's] body. The officer felt it necessary to stop Payne to prevent him from possibly retrieving another weapon or escaping, possibly in one of the patrol vehicles or one of the civilian vehicles that was on scene or passing by.

There is no dispute that Payne was verbally and physically aggressive, combative, and resistant throughout his encounter with officers. Payne's only response is an attempt to justify his actions based on fear unsupported by any actual evidence. Despite Payne's verbal and physical

assaults, the summary judgment evidence shows Officer Duffy did not use force beyond that necessary to subdue Payne, giving Payne multiple opportunities to comply before finally employing the taser. Officer Duffy's actions, according to the video evidence, were measured, ascending only when necessary and in direct response to Payne's actions. Payne acted erratically throughout the encounter, talking over the officers, refusing to listen to them, and generally acting in an irrational and combative manner.

Being mindful that Officer Duffy's investigatory stop and subsequent arrest of Payne "necessarily carrie[d] with it the right to use some degree of physical coercion" *see Graham*, 490 U.S. at 396, and that the officer was making "split–second judgments" in an extremely tense, dangerous, and rapidly evolving situation, *see Singleton*, 2024 WL 2891900, at *6, the Court finds Officer Duffy's actions were not excessive, but were in fact measured and objectively reasonable. *See Betts*, 22 F.4th at 582. Payne posed an immediate threat to the safety of both Officer Duffy and Officer Montero, physically attacking Officer Duffy with a knife and his hands. Payne actively ignored officers' orders, actively resisted detention and arrest, and attempted to evade detention and arrest by flight. *See Darden*, 880 F.3d at 728–29. Officer Duffy did not immediately resort to force, using verbal commands up until the very end. *See Singleton*, 2024 WL 2891900, at *5. Officer Duffy's actions were measured and ascending in response to Payne's refusals to obey commands and his physical aggression. *See id.* Payne had a deadly weapon and twice tried to attack Officer Duffy with it. *See id.* Payne also attacked Officer Duffy with his hands. *See id.* Payne acted erratically and continually attempted to move outside the officers' sight, at the end running down the access road in an attempt to evade officers. *See id.*

Based on the evidence, the Court finds Officer Duffy has established as a matter of law an absence of excessive force and, as to qualified immunity, Payne has failed to carry his burden to show a Fourth Amendment violation. *See Darden*, 880 F.3d at 727–29. Payne's claim that Officer Duffy's actions were "excessive to the need" and "objectively unreasonable" is "blatantly contradicted by the record, so that no reasonable jury could believe [him]," and this Court cannot and will not adopt his version of the facts for purposes of ruling on Officer Duffy's motion for summary judgment. *See Scott*, 550 U.S. at 380. (2007). The undisputed summary judgment evidence shows Payne refused multiple orders to get on the ground and stop approaching officers. He physically attacked Officer Duffy no less than three times and continued to resist efforts to detain him up until his placement in the transport van. While subdued, he kicked another officer. As for the "evidence" presented by Payne to support his claim of excessive force, it consists of nothing more than mistaken belief that the officers had no right to detain him, thereby justifying his actions. Payne's claims that Officer Duffy's actions were excessive and unreasonable were "utterly discredited" by the video evidence, compelling this Court to find in favor of the officer. *See id.* at 380–81. Given the evidence, the Court finds a rational factfinder would not find for Payne on his claim of excessive force, thereby entitling Officer Duffy to summary judgment. *See Hunt*, 730 F. App'x at 212.

## CONCLUSION

Based on the foregoing analysis, the Court finds Officer Duffy is entitled to summary judgment as to Payne's § 1983 claim of excessive force. This finding compels a denial of Payne's motion for summary judgment. As for Payne's excessive force claim against the defendant he identifies as "Joseph Sirola," it is, as discussed above, subject to dismissal for want of prosecution.

**IT THEREFORE ORDERED** that Officer Duffy's "Motion to Dismiss Pursuant to Fed. R. Civ. P. 12(c) and/or Motion for Summary Judgment Pursuant to Fed. R. Civ. P. 56," (ECF No. 44) is **GRANTED**.

**IT IS FURTHER ORDERED** that Payne's excessive force claim (ECF Nos. 14, 18) against Officer Duffy is **DISMISSED WITH PREJUDICE** and Payne shall take nothing in this cause against Officer Duffy.

**IT IS FURTHER ORDERED** that Payne's excessive force claim (ECF Nos. 14, 18) against the defendant identified as "Joseph Sirola" is **DISMISSED WITHOUT PREJUDICE** for want of prosecution, and Payne shall take nothing in this cause against the defendant identified as "Joseph Sirola." *See* FED. R. CIV. P. 41(b).

**IT IS FURTHER ORDERED** that Payne's Motion for Summary Judgment (ECF No. 52) is **DENIED**.

It is so **ORDERED**.

**SIGNED** this 29th day of August, 2024.

_____
XAVIER RODRIGUEZ
UNITED STATES DISTRICT JUDGE